Good morning. The fourth district appellate court of the state of Illinois has now convened. The Honorable Robert J. Steigman presiding. Good morning, counsel. Good morning. Our case number 420-0356 Landers v. Pritzker. For the appellant, we have Carson Griffiths. You are he, sir? Good morning. Mr. Griffiths? Yes. Is that pronounced correctly? It is, Your Honor. Thank you. And for the appellee is Richard Stewart. You are he, Mr. Stewart? Yes, sir. Okay, then we'll proceed at this time, and Mr. Griffiths may proceed, sir. Thank you, Your Honor. May it please the court, Assistant Attorney General Carson Griffiths on behalf of defendants. This court should vacate the circuit court's preliminary injunction requiring the Illinois Department of Corrections to accept all inmate transfers without any quarantine or testing procedures in place to prevent the spread of COVID-19 because plaintiffs failed to show that they were likely to prevail on the merits of their mandamus claim. That claim was premised on the notion that the governor lacked authority to impose quarantine or testing measures on inmate transfers under the Illinois Emergency Management Agency Act. But the executive order was plainly authorized by Section 7.8 of the Act, which states that the governor may control the movement of individuals in a disaster area and the occupancy of premises therein. Executive Order 2020-50 both controlled the movement of inmates within the state of Illinois and the occupancy of IDOC facilities in the state. Accordingly, plaintiffs were unlikely to prevail on their mandamus claim, and the preliminary injunction should not have issued. For their part, plaintiffs don't dispute that the plain language of Section 7.8 authorized the executive order. Instead, their position, and the circuit court's position as well, was that even if the Act did authorize the governor's executive order, the emergency powers under the Act can never be used to alter any mandatory procedural obligation on any government agency, including the Department of Corrections. In other words, they contend that government must continue to operate as though no pandemic existed, no matter what the governor's emergency powers might say. But that conflicts with the Act's express purpose, to confer upon the governor powers necessary to protect public safety during a disaster. It significantly hinders his ability to decide whether the normal operation of government must be altered to protect the public, and simply the legislature did not intend to, on the one hand, grant the governor broad emergency powers, and then simultaneously, on the other, severely restrict those powers whenever they might brush up against the operations of a government agency. Plaintiffs also invoke two exemptions under the Act in Section 3. First, Section 3C, they argue that county sheriffs are police forces under the language of that exemption, and that, therefore, the governor could not alter their ordinary duty to accept inmate transfers. Counsel, I have a question. Is it the responsibility of a sheriff to house prisoners who have been committed to the Department of Corrections? No, Your Honor. It's not their duty under ordinary circumstances, and again, Executive Order 2020-50 didn't place that burden on sheriffs. It simply said that before transferring inmates, IDOC will accept inmates, but before transferring them, quarantine them and test them in order to prevent COVID-19. Suppose they don't accept the prisoners that have been committed to the Department of Corrections. What's the sheriff supposed to do with them? Well, Your Honor, there was no evidence in the record to support the notion that IDOC would not accept transfers of inmates who had been quarantined and tested under their protocols, both of plaintiffs' witnesses at the July 28 hearing admitted— That's not responsive to my question. My question is, what is a sheriff supposed to do if the sheriff, pursuant to a court order and pursuant to statute, had transferred the prisoner who's committed to the DOC to the DOC receiving station, and DOC refuses to accept that prisoner, then what is the sheriff supposed to do with the prisoner? Assuming that there was a circumstance in which IDOC refused to accept an inmate who had been quarantined and tested, the sheriff in that circumstance likely would retain custody of— I didn't put a preface on quarantine or anything like that. I asked you what is the sheriff supposed to do with the prisoner. Your Honor, in that circumstance, the sheriff would be left with holding custody of that inmate, but that, again, that's never been the circumstance in this case. Would the sheriff have the authority to continue to hold this prisoner who's been committed to the Department of Corrections? Would the sheriff have the authority? Yes. And so what would the authority be? The authority would be, well, in any other normal circumstance under IDOC's receiving procedures, there is a period of time before which inmates are transferred after a minimus is entered. So that authority is necessarily implied in the statute to begin with. And, again, I would just emphasize that— It's implied in what statute? I'm sorry, Your Honor? It's implied in what statute? The Code of Corrections, Section 3-8-1, under receiving procedures. The code envisions there being a period of time from which the minimus issues to actually transferring an inmate to IDOC and give this IDOC some discretion. I apologize, Your Honor. I'm going to assume that you don't know of any authority that the sheriff would have, since you haven't answered my question, to hold a prisoner that's been committed to the Department of Corrections. Is that fair? I think it's fair under normal circumstances, Your Honor. Again, this is a situation where the act confers upon the governor very broad authority to protect the public. Mr. Griffiths, let me interrupt here for just a second. I want to make sure I'm clear on what you're indicating to Justice Turner. So you're likening this to the situation where, at the trial court level, a judge has sentenced someone to the Department of Corrections. They don't immediately go to the Department of Corrections. They have to normally go back to the county jail. They're housed there until transport is arranged. Is that what you're referring to? Correct, Your Honor. In a normal circumstance, when there's no quarantine or testing procedures in place, the minimus does not say the inmate must be transferred in X number of days or immediately. It just orders the inmate to the custody of IDOC. Then, under normal circumstances, there is a period of time in which inmates are—they schedule a transfer of inmates. Inmates are actually brought from the county. So there's necessarily a period of time there where, despite an order sentencing an inmate to an IDOC having been issued, the inmates are still in the custody of the county sheriffs. Well, Mr. Griffiths, let me follow up on the questions of my colleagues and ask this. If a sheriff has an inmate or is in custody of someone who's been committed to the Department of Corrections and delivers that person to the Department of Corrections, they say, we're not going to accept them. Doesn't the sheriff have authority to just let them go? No, Your Honor. I don't believe that the sheriff does have such authority. Again, there's an order in place that's actually committing an inmate to the custody of the state. And that would be, you know, obviously, I think in a normal circumstance, something that we wouldn't want to encourage county sheriffs to do. Well, how long can or should a sheriff hold— Judge, I'm sorry for interrupting. —in that situation? Judge, I'm sorry for interrupting. Judge Holder-White needs to connect back. Well, let's wait. Justices, this is the clerk. Justice Holder-White just called me by phone and said her computer has shut down. As you can see, she's not on the screen, and she has a technical difficulty. So we're going to have to take a recess if the court will— What would you like to do? Would you like to recess for a certain amount of time? Obviously, we would want to get Justice Holder-White back. Do we have any idea how long that might be? I'm going to call her right back, Judge. We are back together once more. So I'm picking up, Mr. Griffith, following up on the questions of my colleagues. Would the sheriff have the authority to simply discharge someone who's been committed to prison by court after being sentenced because he showed up at the prison with the prisoner, and the DOC says, no, we're not taking him? No, Your Honor, he would not. The only way that a sentence— There's prescribed sentences in the criminal code set by the legislature. Those have to be served except in circumstances that are laid out, such as good time credit or other ways of shortening a sentence. So, no, the sheriff could not simply release an inmate if, for example, a receiving station—or, excuse me, a receiving center was full under normal circumstances. It's the old story. Everyone has to be somewhere. And if DOC won't accept someone and the sheriff has custody of them, you made reference to how a commitment to prison doesn't mean that instant as if somehow there's a transporter beam to shoot this guy from the courtroom where he's been sentenced to DOC. There's some time built into the process. But there is no language in the statute otherwise for time being built into the process that would last for weeks or months, which is, going back to Justice Turner's question, what you are, by your answers, suggesting might happen, isn't it? It wouldn't be weeks or months, Your Honor. Again, the quarantine period is—well, I'd say it would be weeks but not months. So the quarantine period is 14 days. And, yes, a transfer would be delayed if an inmate, say, tested positive. But, again, as you pointed out, Your Honor, there is a period of time envisioned in the Code of Corrections under normal circumstances. And, in fact, I looked at Section 3-8-1, the language there, and it says that, you know, in the execution of a minimus, the sheriff shall deliver such person to the nearest receiving station of the department. It doesn't say when or how, but it does say— it envisions there's a period of time after a minimus has issued, and the sheriff continues to have custody of that person. All the executive order did here was say, before essentially adding additional procedures that need to be complied with before the inmate can be transferred during that interim period, it said quarantine and test. And that's necessarily part of the governor's broad authority under the Act to control, again, the occupancy of IDOC facilities, control the movement of inmates. There was no—to prevent the spread of COVID-19, the governor needed to restrict the free flow of inmates back and forth from one community to the next. And to do so safely, understanding the counties needed to continue to transfer inmates, the governor imposed these reasonable limits on the authority of— Let me ask another question. This is an unusual case. This is the second time we've had oral arguments pertaining to it. And back on just six weeks ago, this court granted the defendant's emergency motion for state pending appeal. And I want to ask you, as I will ask Mr. Stewart, how what the court said there should inform your position now before this court or how this court should be dealing with the issue now before us? Well, I think Your Honor has made some important findings in that order regarding specifically Section 7-8, also Section 3C, because largely the basis for that order was the fact that appellants were likely to prevail in this appeal based on the merits of their statutory interpretation argument. So I think that this court's interpretation of the act should be guided by the stay order. I think also to the extent that circumstances have changed since this court stayed the order, obviously, you know, effectively by staying the order, this court put Executive Order 2020-50 back in place, and over 1,300 inmates have been transferred from county jails to IDOC facilities since the order has been or excuse me, since the preliminary injunction has been stayed. It shows that the system is working. And, in fact, only 13 inmates have been rejected because of a lack of paperwork or testing. That's an interesting question, and it's one I was going to ask. How do we know, and has anyone provided us other than this very second, through you, with data on what's happened since August 18 when we lifted or granted your emergency motion for state pending appeal? Now should that data, whatever it is, and we'll give Mr. Stewart an opportunity to address it, how should that inform our thinking of this? Well, I think, Your Honor, to the extent this court wants to see any data, obviously, I'm more than willing to provide that after argument today. Have you provided it to Mr. Stewart before today? I have not, Your Honor, but I know that IDOC and county sheriffs are in discussions about transfers and also how many inmates have been accepted and other things like that. I'm not exactly sure. Why didn't you provide that to Mr. Stewart? Without telling us. I did not convey it to Mr. Stewart, one, because he did not request it, and also I think he's, well, he did not request it directly in the context of this appeal. Again, the county sheriffs and our office are in discussions about that information. So it's very peculiar that you would volunteer this information to the court at oral argument, and apparently this is the first time that Mr. Stewart is hearing it, and we didn't ask you for it. You volunteered it, and I would think that Mr. Stewart similarly should have been provided with this information for his consideration before oral argument. Well, I apologize for not forwarding that information to Mr. Stewart before oral argument. And also in context of this order. Before you move on, you said 13 inmates, not 13, 1,300 have been transferred and only 13 rejected since this court made its order on the stay. Rejected because of either an inability, or excuse me, a lack of paperwork or because of a positive test. Okay, but 1,300 and 13 were the two numbers that you gave us a few moments ago. Yes, that's right. Thank you. And again, I apologize for not conferring that information to Mr. Stewart beforehand to the extent that obviously, you know, he would want to address that in any sort of supplemental briefing. I'd be more than willing to do that. Also, this court need not consider that evidence. Obviously, it was not before the circuit court when it entered its preliminary injunction. So the only thing before this court is the preliminary injunction. And so on the basis of this record, I volunteer that information, but it's not necessary to decide this appeal. Mr. Griffiths, I have a few questions related to what we are here for the preliminary injunction. I think we can all agree that there are four factors that we're supposed to be looking at for the preliminary injunction. And I'm wondering, did your brief address the factor of no adequate remedy at law? No, not directly. Why not? Well, because I think that that circumstance would be met or excuse me, the plaintiffs could establish that element generally and no adequate remedy at law would say, you know, you can't get money damages for this. And to the extent that plaintiffs were arguing that they could not transfer inmates under the prior executive order, damages would not solve that problem for them. So I think to the extent I did mention the existence of an adequate remedy at law in the reply brief because plaintiffs brought up this notion that there's a financial hardship on the counties by continuing to house inmates. And in that circumstance, that might be something where there is an adequate remedy at law. And again, that also wasn't in the circuit court's findings. The circuit court's finding was that there was a reparable injury because county jails were at or nearing capacity. You do agree that is one of the elements of the four elements that they need to show. I do, Your Honor, yes. And then my other question is with respect to the preliminary injunction, if they are unable to raise a fair question, as the case law references it, as to those four elements, do we even get to the issue of balancing the hardships and the public policy or public impact? No, Your Honor. If plaintiffs can't make out their prima facie case under those four elements,  need to reach the balancing of the harms. And they do have to make a fair showing or raise a fair question as to each element in order to get to that next step? Yes, Your Honor. And in fact, this court has vacated preliminary injunctions based solely on the lack of a likelihood of success on the merits. So if plaintiffs can't establish each and every one of those four elements, you don't need to reach the balancing. You would not even need to reach the question of, say, if plaintiffs were unlikely to prevail on the merits of their mandamus claim. So just briefly with the time I have left available, I would refer this court with respect to Section 3C to its state order where it correctly interpreted that exemption as applying to police forces and law enforcement's core functions rather than its incidental activities. And Mr. Griffiths, I'm sorry. I know you've only got a little bit of time left, but I did have another question on that. I've been thinking about that and what the statute is saying. Is there any – do you think there's any indication that possibly what the statute refers to and not altering or changing those responsibilities, is it possibly talking about, okay, we can't make the police, the fire force, or construction? Is it possible that that's what they're talking about? That is possible, Your Honor. I think also the important thing is to view that exemption in the context of the act as a whole, right? So the act as a whole is designed to protect the public in a disaster. Law enforcement, firefighting forces, units of the armed forces, the three groups listed in 3C all protect the public from a disaster. So I think largely what that exemption exists for is to say police, firefighters should not need to worry about performing their normal functions, protecting the public in an emergency situation. Nothing in this act should be construed as preventing them from protecting the public. And that aligns with the act's purpose, and it aligns with the text of that exemption itself. Thank you, Your Honor. You can finish yourself. Thank you, Your Honor. It aligns with the purpose of the act and also the exemption itself because those are three public safety agencies grouped together, read together. The best reading is that it's designed to allow them to protect the public. Thank you, Mr. Griffith. You have another opportunity to address us in rebuttal. Mr. Stewart, you may proceed, sir. Mr. Stewart? Sorry, just unmuting my microphone. Good morning, Your Honors. First of all, before we go any further, I did want to take the opportunity to thank the court for their last opinion, especially the concurring opinion where DOC was admonished to act in good faith under EO50. We believe without that they would not have been taking prisoners. As far as Mr. Griffith's assertion that 1,300 had been taken since the issuance of the stay, we don't have any numbers. We haven't been provided anything. And we believe the majority of those were taken between the third, the day we got the preliminary injunction, and the 20th, the day the stay was issued. That's an important point. Mr. Griffith's voluntary data, and I'm curious as to post our vacating the stay, what those numbers are. I got the impression from Mr. Griffith those were the numbers post stay, but now you're suggesting they are the total since the court entered its preliminary injunction? Yes, they very well could be. From just my conversations with my clients, that the majority of those numbers, and in a response sent to us by the Attorney General's office when we had written them a letter that we sent to them on August 26th asking questions regarding their procedures, the response back was since the preliminary injunction was issued, at that time it was 1,300. Now that was on the 26th. We sent them a rather lengthy letter that included a lot of attachments with questions regarding their current procedures. To this day we have never gotten a detailed answer. We have asked for conference calls to ask these questions and to discuss these matters, and we had preliminarily tried to have a conference call yesterday. The Attorney General's office never got back to us. They have not answered any of our questions. Counsel, do you think it would be appropriate for this court to consider what has transpired since this court made its ruling on the motion to stay? No, Your Honor. I don't think it would be because that right now. You just said you appreciated the special concurrence. I do, because I think it has gone to, I don't think without it, I think we would have been shut down. And in the information we sent to the AG, the day after the stay was issued, they issued an email to all the sheriffs saying they were suspending intakes. We got that. The day after the preliminary injunction was entered by Mike. No, the day after this court entered the stay, and I can supply the court with this letter to show what we said, but the day after the court entered the stay, I believe. We've never entered a preliminary injunction. No, no. I'm sorry, I misspoke. The day after the stay was entered, the next day, I believe it was at 1122 AM. They sent an email out to everyone saying they were not going to be accepting intakes on Monday. And so we had that in between, I believe it was actually in between the time of the initial stay and the revised stay. Counsel, I want to ask you something. Suppose opposing counsel is correct. 1,300 inmates have been transferred since this court stated the preliminary injunction and only 13 have been rejected. Wouldn't that be a pretty good argument? This really is not the type of an emergency where a preliminary injunction should be entered or contended. Well, maybe in the normal circumstances, but the fear is on our end is if the preliminary injunction is. You know, vacated. IDOC would have full reign to go back to doing what they were doing before the preliminary injunction. Which was not the underlying mandamus. We, we, we would, but again, you know, We would be in that situation where we're not, nobody is going out and you know, I can address what the actual normal procedures are for delivery of someone's IDOC in a non COVID setting. What has, what happened before? And there really was no procedure. Okay. It was, all you had to do was call IDOC by three o'clock the day before you wanted to bring in. Tell them who you were bringing. And then the next day you brought them. There was no procedure. And if there was a delay between the court ordering them committed and then being taken, it was usually a delay that the sheriff had decided so that instead of transporting one person a day, he could be transporting, you know,   that was the way they would go was there was no formal procedure. Now. One of the things about the. I believe it's the July 27th memo that I, we think was interesting and would take care of the governor's. Concerns regarding quarantining and testing. And would be totally within their purview because it would, it occurs after they've accepted the prisoners. Okay. They have been under their own memo. Once they take in an inmate from a County jail, they are testing them and quarantining them for 14 days. And then at the end of that 14 days, they are testing them again before they move them into general population. So they are doing the testing on their side. What they have now done is they have made the testing, a condition of us even bringing them. And we are still having the situation where we have, we have sheriffs that cannot get the test in 72 hours. They just can't. I don't understand. If DOC is doing the tests and doing the quarantine, why are we even here? It sounds like to me that issue has been resolved. Well, no, they're doing it on their side. They're still requiring us to do it, to even bring them. And they're rejecting anyone that hasn't, we can't do that for. They're not taking them. My point your honor would be that they have a procedure in place on their side. You know, the, the concern that they, you know, that they're raising that, you know, we need this testing before anyone comes in, they're taking care of that on their side. After the person has already been accepted, which relieves the sheriff of the inmate, allows the sheriff to fulfill his statutory duties under the code of corrections and prevents the sheriff from being in contempt. The sheriff you're right. You know, this court is right. The sheriff can just not release somebody. You know, DOC says we're not taking them. The sheriff just can't say you're free to go if they've been sentenced to the department of corrections. And so what happens is, is the sheriff has to take them back and has to hold them. Now what statutory section says that I can't find. It's not even in the statute that happens. That's just a county jail act. I've looked in the unified code of corrections. I've looked in the county's code. I don't see that provision. You two are referring to that requires the sheriff to continue to hold someone after that person has been committed to DOC and DOC has refused to take custody of that person. There is no statute that says that. Okay. Well then what authority and here's what I'm asking is what authority allows the sheriff to continue to hold these people. And if there is no authority, what prohibits that person from filing a writ of habeas corpus to say, bring me before court and let me go, because that is covered in the habeas corpus act. If the sheriff is improperly holding these people, isn't that a problem? Sorry. And your honor, that has actually happened in Logan County. There was a specific situation in Logan County where inmates were turned over to corrections. They tested positive on a quick test were turned back over to the sheriff. And I believe those inmates now they filed a lawsuit naming the sheriff and I'll be a co-defendant of the sheriff's is the Illinois department of justice. So now we're on both sides with them. We're, and they were alleged, because the warden of the jail had signed off on the receipt of the inmate and then sent the inmate back and the inmates said, well, wait a minute. I've got signed that I was accepted by IDOC sheriff. You can't hold me anymore. And they filed, they filed. I don't know what they filed. I think they filed in federal court, but that's the very thing that can happen. Now I would say my clients, the sheriffs, the reason they are not releasing people is because they're trying to protect the public. These people, some of these people have been sentenced, you know, some of them are dangerous felons. They're not going to release them into the public. Council. I assume you would agree with me that it is normally not the responsibility of the sheriff to house a felon who's been convicted and committed to the department corrections. I would absolutely agree with you on that. Okay. So once then that prisoner has been taken to DOC and rejected and the sheriff continues to hold that person, hasn't the sheriff taken on a new responsibility that never had before, but for the governor's executive order. And if so, because I think the answer is going to be yes to that. Hasn't that affected the responsibilities of police? Yes, your honor. It has. And the preface to the final answer was that you agree with me that I agree with you. Have been taken on. They have been taking on extra duties. They otherwise wouldn't have. Let me follow up with a quick question. And the same point that justice Turner's been raising, could the governor order the sheriff's inmates under section eight of the act? Could the governor order? Could the governor order the sheriff's to hold inmates sentenced to DOC under section eight of the act? Yes. No, your honor. I don't believe he could because we have the private criminal. I think it's called the private criminal detention act in Illinois, the moratorium on that act. And in that act, and the intent of that act, I believe we referenced it in our brief is that the state is extra when it, when someone is committed to corrections, the state is exercising its coercive police powers. Okay. And the statute says they cannot give that up to anybody and they don't, they cannot give that up to the sheriff. The statute says, it is the responsibility of DOC and DOC has to take them if. Well, under the emergency powers that the governor claims to possess and these executive orders and that Mr. Griffith has been arguing the governor possesses and to address justice Turner's question about where would the authority reside in the sheriff's for instance, the case you just mentioned to keep holding prisoners who've been committed to DOC for weeks or months, I guess there's no limit to it. Arguably could the governor's executive order, the issued one provide supposedly the basis for the authority of the sheriff, the whole committed prisoners. I think there may be some authority at however, I believe it is in the code, the County code. I know there is a provision in there and I want to say it is, um, and I can't remember the provision off the top of my head. I'm sorry, your honor, but there is a provision in there, uh, regarding holding of warrants that allows the sheriff to enter into an intergovernmental agreement to hold, um, someone else's warrants like a police agency's warrants or DOC's warrants. DOC issues administrative warrants as well, but it's an intergovernmental agreement. There has to be an agreement by the sheriff to do so, not just unilaterally imposed. You commented earlier that your thought, uh, our decision and the special concurrence might've been helpful in causing DOC to perhaps behave differently than you might've otherwise to be more cooperative or acting in good faith. Was that your suggestion? I believe so, your honor. I think specifically, this is a strange case because it's kind of supposed to our typical case. This is kind of a moving target for lack of better way to describe it. Uh, do you have any concerns? What might be the position of DOC once we come up with a decision and we no longer have, uh, this matter pending before us in any procedural capacity? We do have concerns. We have concerns that if the preliminary injunction is vacated and we no longer have an active court case against DOC, that they will go back to, um, not taking anyone. The first time they took anyone was the day after we got the preliminary injunction. The only reason we believe that they have continued to take people after this court stay, um, is because of justice Eichmann's concurrence and told them to act in good faith. Now, I mean, there have been problems with that. We've tried to address them. Even EO 50 says IDOC is supposed to work with the sheriffs to try and, you know, facilitate transfers. And every time, um, my clients have reached out, we have reached out to the AG to try to facilitate conversations. Nothing happens. Everything has been unilateral by IDOC. And we are concerned that, you know, given their conduct that everything has been a unilateral action, absent absent the preliminary injunction, we are going to, we're not going to be able to have anybody. Let me ask this council for your advice, given how unusual this case is. Uh, what procedurally would you suggest to us? Well, regard to our decision in this case, particularly if, uh, it appears that technically the preliminary injunction might not be appropriate and that would be our thinking, but what would be, what then what, if anything, can we say, uh, how do we keep some sort of, uh, scrutiny over this case where, uh, possibly DOC things we need to continue to act in good faith to avoid  Well, I think the, um, the first thing would be is that currently there are still matters in this case, pending in the circuit court, uh, that are what the department, um, the defendants had filed a motion to dismiss that is still pending. We have not had any hearings on the merits of the mandate. Secondly, there was evidence that was put in after the issuance of EO 50, but prior and after the hearing on the preliminary injunction that the court below had said when it issued the preliminary injunction, the defendants could have that evidence introduced at a hearing to modify the preliminary injunction. But instead of seeking modification, the defendants exercise their right to an immediate appeal. So if this, if the preliminary, even if the preliminary injunction were to stay in place and you know, we believe that based upon the, uh, standard of review that this court exercises in a preliminary injunction, which is an abusive discretion and based upon the ruling issued by the lower court, the, there is no abusive discretion by the lower court and that below the plaintiffs had raised a fair question as to each of the elements. Um, we did not have to prove absolutely that we would win our case. We had to just raise a fair question that we could. Now, I think if it goes back down, the, the court below could easily modify the injunction based upon new evidence that would be submitted by the defendants and by, and by the plaintiffs below. But I think if the data, for instance, that Mr. Griffith had previously told us about, for instance, that that data could be submitted, we could submit data regarding our requests for information that have been denied and all of that could be submitted. And the court below would be able to modify the preliminary injunction based upon the standards of the statute and based upon if it felt that that was necessary. And I believe, and the court below had specifically, I don't want to use the word admonished, but it specifically directed the defendants and provided them guidance for what to do and had given them the opportunity to have that heard on August 7th and had told them at the end of the hearing. And we quoted it directly in the brief for that reason, the judge had told them you said, you know, on the 7th, we'll consider modifying this, but that was not the route they took. And so, you know, the court below has hinted that it is willing to look at that evidence. And if this court feels it's appropriate, they could put it back. They could remand it back to the lower court to look at evidence since the issuance of the preliminary injunction to see whether or not there needs to be a modification. But Mr. Stewart, that evidence is not even a record in it. Do you agree that it's not relevant to what we're reviewing here today? What we're reviewing here today, it's not relevant to that. I was trying to answer Justice Steigman's question specifically about what could happen. You know, what could this court do to keep it alive? That evidence was not put in. The evidence that was in is based upon the evidence that the lower court heard on the preliminary injunction had the plaintiffs raised a fair question. And was it, was the court's decision below sound or was it an abuse of discretion? And the standard I think is best put out on the abuse of discretion in Gun Save Lives V.R.O. in this court's ruling last year. Are we interpreting the statute as it relates to what powers the Emergency Act gives the governor? Is that question one of statutory interpretation and review? I would think it's still an abuse of discretion because it would be de novo review if the court, if the court below had only made findings of law, but the court below in deciding whether or not we had raised a fair question for a writ of mandamus had to make findings of fact. And I've referenced those findings of fact in the brief. I don't want to take any more time. I see my time is up, but I think that, you know, this would still be a review of an abuse of discretion and whether or not the court's decision was reasonable below. It doesn't necessarily mean this court has to agree with the court's decision below. Okay. But mere disagreement is not an abuse of discretion. Okay. Well, thank you, counsel. I give you an opportunity for rebuttal. But before you begin, I'm curious about your position on the same question I raised to Mr. Stewart. First, he suggests that possibly this court's decision vacating the granting the emergency stay might've had some effect on whether DOC was going to act in good faith and the intervening six weeks. And Ray, he raised concerns as you heard that if you were to prevail before this court and that was the end of it, then maybe the incentive for DOC to be acting in good faith would evaporate and they would just decide, we don't, we can just do whatever we wish and we don't have to be concerned with the sheriff's concerns at all. What about that? Well, first of all, your honor, I think, um, with respect to whether IDOC would have acted in good faith, uh, regardless of the special concurrence, that's absolutely the case. And it's important to note that what is of record here is that the new protocols for testing and quarantining were put in place the day before the circuit court's hearing on the renewed motion for preliminary injunction. So there was never an opportunity for those procedures to actually work themselves out or county sheriffs and IDOC to confer and figure out how this process is going to work in this unprecedented situation. And so there's really no basis to conclude that IDOC would have acted in bad faith if that's what the circuit court concluded. There also was no finding by the circuit court of, uh, such action. It would be entirely speculative for the circuit court to have, uh, found that IDOC was going to refuse any inmates who, um, met the quarantining and testing procedures. Uh, as far as whether if we prevail and, uh, vacate the injunction, whether there would be an issue, first of all, a concern about whether this would work out or not, this court has to find first that the circuit court correctly issued the injunction. Um, and if the circuit court misinterpreted the law, which is our position here, really any concerns about the practical effects should give way again, that's, um, issues that are worked out between IDOC and county sheriffs all the time. These are independent government bodies. They have to work out problems between one another in a lot of circumstances. Um, and so, so this court shouldn't concern itself. If it finds that the circuit court committed legal error, it should vacate the preliminary injunction. If we agree with that and we vacate the preliminary injunction, would it be correct that we'd be remanding for further proceedings because there's still pending stuff before the trial court? Absolutely, Your Honor. And that was the point I was, um, just reaching, was that Mr. Stewart recognized there's pending motions below. Um, ultimately this could, if say for instance, um, uh, the state were to lose its motion to dismiss and the case proceeded to a preliminary injunction proceedings or a trial on the mandamus claim. I mean, that's not our, obviously we would argue that that's not the correct result here, but there are further proceedings below. So should anything change between now and then the circuit court could hear additional evidence. There's, there's all sorts of proceedings that need to happen below. This isn't the end of the case here. This is an interlocutory appeal. One other question about this, uh, regarding the data you earlier provided, uh, I would like to be clarified, whether that data was since the trial court entered its initial order or was it since this court, uh, entered the order vacating or granting the emergency motion for a state? It is since this court entered its, uh, state order. So there've been 1300 people received by DOC since and only 13 rejected? Yes. I want to clarify on the rejected point. The 13 rejected were inmates who were rejected because of a positive test or because they didn't have paperwork showing that they were negative. So that's how few have been. There have been other inmates when the facilities, the receiving facilities have been at capacity at various points since this day has entered as IDOC is transferring inmates to permanent facilities. And there have been periods of time when IDOC says we're at capacity, we can't take anyone else safely. So the 13 is a very specific subset. I was pointing out that it's a very small number of people who haven't been able to be tested or quarantined in compliance with them. If I understand your answer correctly, then what you're talking about about the 1300 is these are people ultimately accepting the DOC, even though they might've been delayed for a few days. Yes, Your Honor. So the total number is over 2,500 since the beginning of this issue. It was about, um, before this court stayed, the preliminary injunction is about 1200 and since the state it's been over 1300. So your position that the situation seems to be working well and DOC is handling it reasonably. Yes, that is our position. And I think that had the circuit court given these procedures enough time to take effect below before entering the preliminary injunction, that would have been the case in the circuit court as well.  but the circuit court really jumped the gun on the finding of irreparable injury based on older evidence under a prior executive order, the issue of capacity under the old executive order that had been rescinded. I'm sorry. Counsel, do you dispute the executive order could or does have the effect of giving the county sheriffs a new responsibility that is to house persons that have been committed to the department of corrections? Uh, I agree that if I may answer your honors. So go ahead. We, we have questions. Go ahead. I'll let you know. Thank you, your honor. Uh, so it does give county sheriffs new responsibilities, uh, explicitly with quarantining and testing. Um, there's nothing in that executive order that suggests that they need to house inmates indefinitely or that for the entire term of their, um, sentence. But yes, it does impose new responsibilities on county sheriffs. And as justice segment pointed out in his question, that's the nature of the emergency management at agency act. The governor has the authority to control the movement of these inmates and the occupancy of facilities in the state. And so he necessarily has to be able to say, how can we do this safely? How can we do this to protect the public? Um, so even if in normal circumstances, transfers happen much more quickly, uh, the existence of the act and the broad delegation of authority to the governor in an emergency, uh, overrides those. Mr. Griffith, uh, we, uh, asked you lots of questions and, uh, you never had an opportunity to say what you wanted in rebuttal. I'll give you a brief opportunity right now for something you want to have. Um, uh, your honors. I think, um, most of my points in rebuttal had been addressed by your honors questions. Um, I think that, uh, yeah, just to point out one last point is that about testing. And Mr. Stewart brought up the fact that, um, IDOC is doing its own testing and who has the capacity to test better. All those are decisions that should be made on the ground by the governor IDOC sheriffs, uh, under the act. Um, it's really not this court's, um, role to decide how best to manage prisoners during a pandemic. Um, that should be, uh, this court should defer to the governor's exercise of his authority so long as it's authorized by the act. And as pointed out for the reasons stated in our brief, uh, executive order 2020 50 was plainly authorized by the plain language of the act. This court need reach no other questions. Well, thank you, Mr. Griffin. I want to mention, uh, this is a difficult and complicated, really unprecedented case for all of us. And I'm sure I speak for my colleagues when I thank you, Mr. Griffin, Mr. Stewart. I think you both did a very fine job in responding to the court's question. And I think the technical phrase is trying to learn us up good. So with that, I thank you. And we'll be in recess.